STATE OF NORTH CAROLINA, EX REL. COMMISSIONER OF IN- SURANCE v. NORTH CAROLINA AUTOMOBILE RATE ADMIN- ISTRATIVE OFFICE, NATIONWIDE MUTUAL INSURANCE COMPANY, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, THE AETNA CASUALTY AND SURETY COMPANY, HARTFORD ACCIDENT AND INDEMNITY COMPANY, GREAT AMERICAN INSURANCE COMPANY, UNITED STATES FIDELITY AND GUARANTY COMPANY, LUMBERMEN'S MUTUAL CASUALTY COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, IOWA NATIONAL MUTUAL INSURANCE COMPANY, ST. PAUL FIRE AND MA- RINE INSURANCE COMPANY, UNIGARD MUTUAL INSURANCE COMPANY, THE SHELBY MUTUAL INSURANCE COMPANY, AMERICAN MOTORISTS INSURANCE COMPANY AND AMERI- CAN MUTUAL LIABILITY INSURANCE COMPANY

No. 7510INS538

(Filed 18 August 1976)

Insurance § 79.1— automobile liability insurance rates — order unsupported by evidence

Order of the Insurance Commissioner fixing automobile liability insurance rates which included a supplementary rate level reduction factor of 5 percentage points for both bodily injury and property damage rates was unsupported by material and substantial evidence where the Commissioner adopted his expert witness's testimony that such reduction was necessary, and the witness based his figure on extremely tenuous theories derived from his personal evaluation of the results and effect of the "energy crisis" and general economic conditions on N. C. drivers.

Judge MARTIN dissenting.

APPEAL by North Carolina Automobile Rate Administrative Office and certain member companies from order of the Commissioner of Insurance filed 28 March 1975. Heard in the Court of Appeals 16 October 1975.

Pursuant to statutory mandate, the North Carolina Automobile Rate Administrative Office, hereinafter referred to as

---

**Comr. of Insurance v. Automobile Rate Office**

---

"Rate Office" files with the Commissioner of Insurance on or before 1 July of each year data compiled under the provisions of G.S. 58-248 and a rate review based on that data. The 1 July 1974 filing used the latest available statistical data reflecting the underwriting experience of all the member companies for the two years ending 30 June 1972 and 30 June 1974. The same rate making process was used by the Rate Office in the 1974 filing as had been used by it for the filing of 1973 and those of prior years. The filing was amended and the amended filing was made on 2 January 1975. This amended filing became the subject matter of the hearing and proposed a rate level reduction of 13.3% for bodily injury and a rate level increase of 22.5% for property damage, or an overall rate level increase of 0.9% for bodily injury and property damages combined, as compared with the original 1974 filing reflecting a proposed overall rate level increase of 3.2%.

On 20 September 1974, the Attorney General intervened on behalf of the using and consuming public of the State of North Carolina. On 25 and 26 November 1974, the Commissioner of Insurance conducted a public hearing which was continued to and resumed on 10 December 1974 and 6, 7, 15, 21, 22, 23, 24, 27, 28, 29 January 1975, and 4, 7 February 1975 and 10 March 1975, concluding on 17 March 1975. While the 1974 filing was pending, the 1973 filing was pending, the order issued therein having been appealed to this Court. We reversed the Commissioner of Insurance, 24 N.C. App. 228, 210 S.E. 2d 439 (1974), and the Commissioner and Attorney General appealed, by reason of a dissent, to the Supreme Court of North Carolina, which affirmed the reversal, 287 N.C. 192, 214 S.E. 2d 98 (1975), and ordered the case remanded to the Commissioner of Insurance for disposition of the filing according to law.

The Commissioner of Insurance entered an order on 28 March 1975, directing that "private passenger automobile liability insurance rates for use in North Carolina in the future be decreased by 23.8% for bodily injury and increased by a (sic) 2.5% for property damage to be effective on May 1, 1975." The Rate Office and the named companies appealed.

*Attorney General Edmisten, by Assistant Attorney General Isham B. Hudson, Jr., for Commissioner of Insurance, appellee.*

*Allen, Steed & Pullen, P.A., by Arch T. Allen and Lucius W. Pullen; Broughton, Broughton, McConnell & Boxley, by J. Melville Broughton, Jr.; Young, Moore & Henderson, by Charles H. Young; Manning, Fulton & Skinner, by Howard E. Manning, for defendant appellants.*

MORRIS, Judge.

This case is before us for review upon seven assignments of error based on 147 exceptions. The assignments of error are presented by defendants under four principal arguments: (1) The order entered was in excess of and contrary to the statutory rate-making procedure required by Article 25, Chapter 58, of the General Statutes of North Carolina and approved by this Court and the Supreme Court of North Carolina, (2) the order is not supported by material and substantial evidence, (3) the order was in violation of the rights of appellants guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution, and the law of the land clause of Article I, Section 19, of the Constitution of North Carolina and in contravention of the provisions of Article I, Section 6, and Article 1 of the Constitution of North Carolina reserving legislative power of the State to the General Assembly; and (4) the order is prejudicial to the substantial rights of the appellants and therefore reversible because it was based upon hearings conducted by the Commissioner of Insurance as a consumer advocate rather than as a governmental adjudicator and independent decision-maker and in an arbitrary and capricious manner denying to appellants due process of law in contravention of the law of the land clause of Article I, Section 19, of the Constitution of North Carolina, and the due process clause of the Fourteenth Amendment to the United States Constitution.

We choose to discuss only one of the arguments. This is not to say that the others are without validity. However, it appears to us that the order is so obviously not supported by material and substantial evidence, that it is unnecessary to discuss the other assignments of error.

Assuming then, for purposes of argument only, that the Commissioner did not exceed his statutory authority as to rate-

making, we look at the entire record to determine whether the order entered was supported by material and substantial evidence. G.S. 58-9.4 provides that "[a]ny order or decision of the Commissioner, *if supported by substantial evidence,* shall be presumed to be correct and proper" (emphasis supplied), and G.S. 58-9.6(b) provides that the court "may affirm or reverse the decision of the Commissioner, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commissioner's findings, inferences, conclusions or decisions are . . . (5) [u]nsupported by material and substantial evidence in view of the entire record as submitted. . . . "

> "Substantial evidence has been described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 95 L.Ed. 456, 71 S.Ct. 456 (1951) ; *see* Hanft, Some Aspects of Evidence in Adjudications by Administrative Agencies in North Carolina, 49 N.C.L. Rev. 635, 666-68 (1971) ; 2 Am. Jur. 2d, Administrative Law §§ 621 and 688 (1962). 'Substantial evidence is more than a scintilla or a permissible inference.' *Utilities Commission v. Trucking Company,* 223 N.C. 687, 690, 28 S.E. 2d 201, 203 (1943)." *Comr. of Insurance v. Automobile Rate Office,* 287 N.C. 192, 205, 214 S.E. 2d 98 (1975).

In his order, the Commissioner made 36 findings of fact. In 25 of those findings, the Commissioner expressly stated that they were supported by the testimony of the expert witness Stern, who testified for the Commissioner. Mr. Stern was a member of the staff of the Department of Insurance, State of New Jersey. No actuary on the staff of the North Carolina Department of Insurance testified, and he was the only witness for the Commissioner.

We think that certain excerpts from Mr. Stern's testimony are revealing.

> "MR. STERN: Yes, I have analyzed and studied this filing, Exhibits RO 22 and RO 22-A which are the exhibits in the record of this hearing and constitute the amended filing which you have just handed me and which is the subject of these proceedings. I will proceed to describe the analysis

I have made of the filing and offer as I come to them any exhibits I may have prepared to illustrate my testimony.

I analyzed this filing and realizing that the statute requires that due consideration be given to past and prospective loss experience and expense experience, I prepared several exhibits pertaining to that matter. But we also know that any other factors, relevant factors, must be considered and I believe that one of the most important such other relevant factors is the effect of the present driving conditions of the population in North Carolina and country wide. We have been supplied, all states have been supplied with very valuable information on this subject through the National Association of Insurance Commissioners. One report was submitted to the NAIC in a letter from the Insurance Services Office dated November 15, 1974, and signed by Mr. McNamara, President of ISO."

"Mr. Stern: I would like to explain first the genesis of this type of information. When the energy crisis began in October and November, 1973, many commissions including the Commissioner in New Jersey where I work, were concerned about methods by which the effect could be measured on automobile insurance rates because the public wanted to know: 'What are you going to do about it?' And various states started contacting companies and organizations about getting some extra statistics and the NAIC stepped in and told the Commissioners, 'Hold it, we're going to get some real good experts together and they are going to see to it that data are collected in an orderly manner.' And at the December meeting 1973 of the NAIC, the Commissioners were informed that the steps have been taken and the data are going to be collected, and this type of data was explained at that time. Now the data were delivered the—the collection of the data was delivered the—limited to those companies that were able to respond quickly and short of the extra expense. Realizing that they are going to represent such a large sample of the total insurance industry, that the data, that the results could be accepted as being significant, the alternative would have been for every state to issue its own call for experience—cost the companies a great deal of expense—and force every company to report on data which really do not vary from company to company. What was to be measured was the effect of people

not having enough gasoline, having to stand in lines to wait for it for hours and what effect it would have on driving conditions; also, of course, the effect of speed limits, the reduced speed limits.

It is obvious that people didn't line up by company in front of the gas pumps; they didn't have special lines for the sixty-five percent of cars which I included in these data for North Carolina and special lines for people in the other thirty-five percent; they didn't have special enforcement procedures for those people who are insured with the sixty-five percent as opposed to those who are insured with the other thirty-five percent. This is the typical kind of other relevent information which is contemplated by the rate regulatory statute; that is, data other than strict'y insurance statistics, other than loss and expense experience. And that is why I made a study of these data to present to you here, today. . . . "

" . . . Now we all were under the impression when we all read these latest releases from the NAIC that the—somebody may call it a trend, has simmered it down and really the third quarter of 1974 has gone back to, somewhat went back to normal. However, we now have an additional piece of information and before I introduce that exhibit, I want to mention this: The NAIC at its last meeting decided to discontinue the collection of these fast track monitoring statistics, probably based on the sentiment I just referred to, that the energy crisis is over. Some states didn't agree and the Commissioner of North Carolina didn't agree and he instructed the two statistical agencies, Insurance Services Office and National Association of Independent Insurers, who are involved in this project, to continue to report to him the data for North Carolina, and such first report was received here with letter from the National Association of Independent Insurers on February 4— the date is February 4, 1975."

" . . . My personal feeling is that a more straightforward method would be to combine claim freqency and claim cost into a quantity which we refer to as a pure premium. Pure premium is simply the average loss cost per car and the loss cost per car depends upon how much you pay on the average per claim and how many claims you have on the average

per car. It is the most straightforward method of measuring really what it costs to insure cars, so I simply took the data shown in the filing for claim cost and claim frequency and I combined them into a pure premium, which is a simple arithmetic calculation of multiplying frequency by claim cost and I would like to offer an exhibit pertaining to bodily injury."

"MR. STERN: To summarize the information we looked at before, we saw substantial decreases in bodily injury frequencies and decreases in property damage pure premiums on Exhibit ID 50. We noted the decrease in loss ratios of the magnitude of, in the neighborhood of five percent for each of the periods of bodily injury and around three percent, four percent for property damage, except for the third quarter of 1974 and that was shown in Exhibit ID 52. And finally we looked at the latest data for the eleven months, comparing eleven months of 1974 compared with the eleven months of 1973, Exhibit ID 53, which indicated a substantial decrease in frequencies in bodily injury of thirteen percent and a property damage pure premium decrease of six percent. There are other relevant factors which affect the cost of insurance, or the occurrence of losses. The reduced—the reduction in the driving and the use of automobiles is not only affected by availability of gasoline, but also by the price of gasoline. Many people have to restrict their driving because of the high cost of gasoline compared with normal times, the years reflected by the accident year experience 1972 and '73, the early part of '73, because the accident year experience ends on June 30, 1973. Another important element that affects the exposure to road hazards is the economic condition of the country, particularly North Carolina. Today's newspaper reports that the unemployment rate in North Carolina is ten point six percent. It must be obvious that people who have to live on unemployment insurance benefits must be restricting many activities and driving should be one of the first ones to restrict. They are troubled by inflation and unemployment, now. It will also affect drinking habits. We know that driving after drinking is one of the very frequent causes of serious injury. Apparently the people are unemployed, they won't go to the bar, they are lucky they can drink their beer at home, which means they won't drive after they have their

beer. And I think prior recessions have shown that, that during a period of recession of reduced activity insurance experience does show an improvement. Now these are qualitative characteristics—we cannot quantify them for you, except for what we have already presented here. I conclude that taking all these factors together, a supplementary rate level reduction factor of five percentage points would be more than justified. And I want to point out this is not a trend factor. Looking at exhibit—

THE COMMISSIONER: Would that be a minus five percent?

MR. STERN: Yes, sir. Looking at Exhibit ID 53, it tells us that the pure premium for property damage liability went down from twenty dollars and forty-six cents in 1973 to nineteen dollars and twenty-six cents. I am not saying that this is a trend that will accumulate from year to year, and if that will present a six percent decrease, it's going to be twelve percent the next year and eighteen percent the next as we do when we use a trend factor, where we multiply the annual increment by the number of years to which you are projecting to. I am simply saying that, let's only assume that the experience will stand still at this point, that the eleven months of 1975 compared to eleven months of 1973 would show the same picture as what we see on Exhibit ID 53 to be true if you compare '74 with '73. I am not suggesting that you can reasonably project into the future—I am only suggesting that we are taking this as the last information we have and base the loss level on this last piece of information.

And again in a qualitative way, I am suggesting that a supplementary factor of minus five percentage points be applied to the rate level calculations. And that means that on bodily injury on Exhibit IB (sic) 56, the minus eighteen point nine would become a minus twenty-three point nine percent. And on Exhibit ID 57-A, the plus seven point one would become a plus two point one. That concludes my observation on this rate filing."

Turning now to the findings of fact, we find:

"6. That the effect of paid claim costs and paid claim frequencies is combined in the average loss cost per car, which is referred to as pure premium, and that a trend adjust-

ment for changes in pure premium is the most straightforward method of measuring the trend in the cost of providing automobile liability insurance, which finding is supported by the testimony of expert witness Stern.

7. That a period of 2.25 years is a reasonable period for computing a pure premium trend factor for the amended filing, which finding is supported by the testimony of expert witness Stern.

8. That bodily injury pure premium for all companies writing private passenger automobile liability insurance in North Carolina for the annual periods ending at the end of each quarter from June 30, 1971, through March 31, 1974, remained basically unchanged, and therefore the bodily injury pure premium trend factor should be unity, which finding is supported by the testimony of expert witness Stern, who concluded, after considering the miniscule annual increase in bodily injury pure premium (most of which resulted from the relatively low starting point in 1971 prior to the relaxing of federal price controls and also prior to the experience period used in this filing), that the appropriate way of reflecting past and prospective bodily injury loss experience in the amended filing is by a trend factor of unity.

9. That property damage pure premium for all companies writing private passenger automobile liability insurance in North Carolina for the annual periods ending at the end of each quarter from June 30, 1971, through March 31, 1974, reflects an annual increase of 4.8% per year, based on an actuarilly acceptable line of best fit method, which finding is supported by the testimony of expert witness Stern.

10. That a bodily injury pure premium trend factor of 1.00 (or unity) provides an adequate bodily injury loss trend adjustment from the amended filing (derived from the finding that such pure premium has remained basically unchanged), which finding is supported by the testimony of expert witness Stern.

11. That a property damage pure premium trend factor of 1.108 provides an adequate property damage loss trend adjustment for the amended filing (derived from the find-

ing of a 4.8% increase per year and a 2.25-year period), which finding is supported by the testimony of expert witness Stern."

"25. That the National Association of Insurance Commissioners 'energy crisis' experience for North Carolina collected under said plan or system represents the private passenger automobile liability insurance loss experience for companies writing approximately 65% of the total premium volume for such insurance in North Carolina and that therefore such experience is significant for rate-making purposes in North Carolina, which finding is supported by the testimony of expert witness Stern.

26. That evidence in the record, including the 'energy crisis' data collected under said plan or system, shows a need for a supplementary reduction in the rate level in addition to those changes set forth above, which finding is supported by the testimony of expert witness Stern.

27. That said 'energy crisis' data reflect the results of the reduction in speed limits, the unavailability of gasoline for some time, and the continued lesser accessibility of gasoline to many because of increased costs, which findings are supported by the testimony of expert witness Stern."

"29. That, taking the latest information available, including the 'energy crisis' data referred to above, along with other relevant factors, such as the rate unemployment in North Carolina, demonstrates the need for a supplementary rate level reduction factor of five (5) percentage points for both bodily injury and property damage rates in addition to those changes set forth above, which reduction is a 'one-step' trend: resulting in a total rate level change indication of a 23.8% reduction in bodily injury rates and a 2.5% increase in property damage rates, which finding is supported by the testimony of expert witness Stern, who reached this conclusion based on all the business done by all companies in North Carolina.

30. That such a further 5% reduction is a conservative reduction which gives full consideration to the partially offsetting effect of inflation, which finding is supported by the testimony of expert witness Stern."

Comr. of Insurance v. Automobile Rate Office

The Commissioner further concluded that "the 'energy crisis' data referred to in the above findings of fact come within the description in this provision of said Article (Article 25, Chapter 58 N.C.G.S.) of what the Commissioner shall give consideration to; and therefore it is concluded that the Commissioner is required by the provisions of said Article to give consideration to the 'energy crisis' data in this record in determining the necessity for an adjustment of rates." He then ordered "that private passenger automobile liability insurance rates for use in North Carolina be decreased by 23.8% for bodily injury and increased by a 2.5% for property damage to be effective on 1 May 1975."

It is obvious that the Commissioner adopted witness Stern's testimony that a supplementary rate level reduction factor of 5 percentage points was necessary for both bodily injury and property damage rates in addition to certain changes he enumerated. It is also obvious that witness Stern based that figure on extremely tenuous theories deriving from his personal evaluation of the results and effect of the "energy crisis" and general economic conditions on North Carolina drivers. Admittedly, the effects on automobile liability insurance costs in North Carolina, if any, of the so-called "energy crisis" and economic conditions are difficult, if not impossible, to quantify. Nevertheless, rates cannot be based upon such speculative statements as contained in the record before us.

In short, in our opinion the order of the Commissioner was not based on material and substantial evidence and must be

Reversed.

Judge PARKER concurs.

Judge MARTIN dissents.

Judge MARTIN dissenting.

On 1 July 1974 the North Carolina Automobile Rate Administrative Office made a filing with the Commissioner of Insurance, pursuant to G.S. 58-248, which proposed statewide average rate level changes and a reduction of 3.7% for bodily injury liability insurance and an increase of 11.4% for property damage liability insurance.

Comr. of Insurance v. Automobile Rate Office

The original filing was based on a calculation of earned premium at the now (and then) existing rate level for fiscal accident years ending June 30, 1972 and June 30, 1973 compared to a calculation of incurred losses (including loss adjustment expense) for the same statistical years but trended to October 1, 1974, for upward trends in average paid claim costs for both bodily injury and property damage claims paid between January 1, 1970 and September 30, 1973.

The original filing was based on further calculations that 27.4% of the premium dollar should be allocated to insurer expenses (other than loss adjustment expenses) based on a special call of insurer expense experience in North Carolina, and that 5% of the premium dollar should be allowed for underwriting profit—thus leaving 67.6% of the premium dollar for the payment of losses and loss adjustment expenses.

On 20 September 1974, the Attorney General intervened in behalf of the using and consuming public of the State of North Carolina.

On 2 January 1975, the Rate Office amended its filing to request 13.3% for bodily injury and a rate level increase of 22.5% for property damage. (The Rate Office had not theretofore employed claim frequency trending which is standard rate making procedure used in many states.) The change in methodology in the amended filing was the use of a trend factor based on a combination of trends in claim frequencies and trends in average paid claim costs, instead of a trend factor based solely on average claim costs, and a trend period ending a year and two months after the filing, instead of a period ending three months after the filing. The combination trend factor utilized by the Rate Office used 16 quarters of year-ended claim frequency experience and 12 quarters of year-ended claim payment experience (both last reported as of the year ended March 31, 1974).

On 25 and 26 November 1974, the Commissioner conducted a public hearing, which was continued to and resumed 10 December 1974 and 6, 7, 15, 21, 22, 23, 24, 27, 28, 29 January 1975 and 4, 7, February 1975 and 10 March 1975.

The hearings on the original and amended filings concluded on March 17, 1975. Much, if not most, of the testimony in the record deals with: (1) details of the present statistical plan

whereby insurers report "underwriting experience" to the three statistical agents: Insurance Services Office, the National Association of Independent Insurers, and the National Independent Statistical Service and the same is combined by Insurance Services Office under the supervision of the Rate Office to make the filings pursuant to G.S. 58-248; (2) the Commissioner's dissatisfaction with the present statistical plan and Insurance Services Office's execution of the plan; (3) the feasibility of amending the plan to secure more detail and more current information; and (4) detailed explanation of the methodology and statistics that Insurance Services Office and the Rate Office use in arriving at the calculations contained in the rate-making formula.

The Rate Office presented the testimony of three witnesses in support of the indicated rate adjustment requested in the amended filing (and in opposition to the testimony of Phillip K. Stern, hereinafter referred to): Paul L. Mize, manager of the Rate Office; John J. Kollar, an assistant actuary with Insurance Services Office; and John H. Muetterties, a vice president and actuary with Insurance Services Office. The Rate Office also offered the testimony of John H. Jeffries, a motor vehicle damage appraiser, to corroborate certain information in the filing dealing with trends in auto repair costs in this State and other witnesses who testified with respect to the present statistical plan and proposed amendments thereto.

The Insurance Department staff presented the testimony of Phillip K. Stern, an actuary with the New Jersey Department of Insurance. Stern based his opinions on: (1) information contained in the amended filing; (2) additional information furnished by the Private Passenger Automobile Accelerated Monitoring (Statistical) System operated under the auspices of the National Association of Insurance Commissioners (which contained certain statistical details for private passenger automobile liability experience in North Carolina with respect to 65% of the business written therein up to and including November of 1974); and (3) general economic conditions.

The majority opinion is that the order of the Commission be reversed rather than modified or remanded for further proceedings. Thus, its effect is a denial of all rates authorized by the Commissioner and the dismissal of the proceedings.

The majority state they looked at the entire record and in their opinion the order was not supported by material and substantial evidence, that being the only question they chose to discuss in reaching their conclusion. The record and briefs raise several other important questions which were not answered.

The standards of "substantial evidence" is widely used in judicial review of administrative decisions. It has been defined by the North Carolina Supreme Court as "more than a scintilla or a permissible inference." *Utilities Commission v. Trucking Co.*, 223 N.C. 687, 690, 28 S.E. 2d 201, 203. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *N.L.R.B. v. Columbian Enameling and Stamping Co.*, 306 U.S. 292, 300 (1939). See generally, Davis, Administrative Law Treatise, §§ 29.01-29.06, pp. 114-149. The correctness and propriety of the Commissioner's order and decision must be judged by this substantial evidence standard. G.S. 58-9.4.

The statuory method for judicial review of decision by the Commissioner of Insurance concerning insurance rates is set out in G.S. 58-9.4 through 58-9.6.

The majority call attention that the Commissioner made 36 findings of fact and in 25 of those findings he expressly stated that they were supported by the testimony of expert witness Stern, who testified for the Commissioner. The majority opinion then recited certain excerpts from Stern's testimony followed by a summary of 11 of the findings of fact. No further mention is made of the 25 additional findings of fact. No further evidence was recited or discussed.

Those additional findings of fact not recorded in the majority opinion, together with the Commissioner's conclusions and order, are as follows:

FINDINGS OF FACT

1. That the present rates for private passenger automobile insurance in North Carolina were established by orders of the former Commissioner of Insurance dated May 26, 1972, and December 4, 1972, with those rates becoming effective October 10, 1973.

2. That pursuant to G.S. 58-248 the North Carolina Automobile Rate Administrative Office (hereinafter called the Rate Office) on July 1, 1974, made its annual private passenger automobile liability insurance rate filing using statistics based on limits of $10,000 each person and $20,000 each accident for bodily injury and $5,000 each accident for property damage (hereinafter called basic limits), which filing did not contain claim frequency statistics.

3. On January 2, 1975, subsequent to a directive by the Department to revise certain parts of the filing to include claim frequency statistics, said filing was amended by the Rate Office, with the amended filing using statistics, including claim frequency statistics, based on basic limits.

4. That there are two modifications to the automobile liability insurance rate-making procedure heretofore used in North Carolina that should be implemented, to wit: (1) a trend adjustment for changes in claim frequencies, which is included in a trend adjustment for changes in pure premium as set out in the findings of fact numbered 5 through 11 below and (2) an allowance for unallocated loss adjustment expenses independent of loss development and loss trends as set out in the findings of fact numbered 12 through 15 below, which finding is supported by the testimony of expert witness Stern.

5. That around 1968 states other than North Carolina began including a trend adjustment for claim frequencies as part of the automobile liability insurance rate-making procedure, but that the Rate Office did not utilize a trend adjustment for claim frequencies until the 1975 amendment to the filing under consideration (which was made following the directive by the Department to amend certain parts of the filing to include claim frequency statistics) and that the failure to consider changes in claim frequencies in arriving at the present rates resulted in a "cushion," i.e., an excessiveness, in the present rates, which finding is supported by the testimony of expert witness Stern.

*     *     *

12. That the factor applied to the combination of losses and allocated loss adjustment expenses to allow for unallocated loss adjustment expenses has over the years gone down, which means that the unallocated loss adjust-

ment expenses did not rise at the same rate as the losses, and that including said factor in the losses before applying loss development and loss trend adjustments, as heretofore has been done in North Carolina, has resulted in an excessive allowance for loss adjustment expenses and has produced a "cushion," i.e., an excessiveness, in the present rates, which finding is supported by the testimony of expert witness Stern.

13. That the proper way of treating unallocated loss adjustment expenses in the rate-making formula is to make an allowance for such expenses as an expense item with a trend adjustment for the effect of inflation on such expenses, instead of applying loss development or loss trend adjustments to such expenses (as heretofore has been done in North Carolina), and that the "cushion" in the premium rates referred to in the preceding finding of fact would be adequate to absorb an inflationary trend in such expenses for the amended filing, which finding is supported by the testimony of expert witness Stern.

14. That adequate allowances for unallocated loss adjustment expenses for bodily injury for the amended filing (based on the Rate Office computed factor of 1.101 applied to the undeveloped combination of incurred losses and allocated loss adjustment expenses before loss trend adjustment) are $5,908,877 for accident year ending June 30, 1972, and $6,063,323 for accident year ending June 30, 1973, which finding is supported by the testimony of expert witness Stern.

15. That adequate allowances for unallocated loss adjustment expenses for property damage for the amended filling (based on the Rate Office computed factor of 1.113 applied to the undeveloped combination of incurred losses and allocated loss adjustment expenses before loss trend adjustment) are $5,486,221 for accident year ending June 30, 1972, and $6,143,337 for accident year ending June 30, 1973, which finding is supported by the testimony of expert witness Stern.

16. That the rate changes proposed by the Rate Office are based on a rate-making formula containing an allowance of 5% of earned premium for underwriting profit and contingencies.

17. That the annual return from the investment of unearned premium reserves and loss reserves for all private passenger automobile liability insurance in North Carolina is 2.3% of earned premium, based on the latest available statistics.

18. That an underwriting profit of 2.7% of earned premium provides for a fair and reasonable underwriting profit within the meaning of G.S. 58-248, which finding is supported by the testimony of expert witness Stern.

19. That adding said 2.3% return to said 2.7% allowance for underwriting profit to arrive at a 5% of earned premium allowance for overall profit and contingencies is an equitable manner of including the amount of earnings from the investment of unearned premium reserves and loss reserves in the rate-making formula, which finding is supported by the testimony of expert witness Stern, and which procedure was set forth and followed in the last order (by the former Commissioner) effecting private passenger automobile liability insurance rate changes, which order was affirmed by the North Carolina Court of Appeals. 18 N.C. App. 23, 195 S.E. 2d 572 (1973), cert. denied, 283 N.C. 585 (1973).

20. That all of the factors, allowances, and adjustments supplied by expert witness Stern are reasonable, proper and correct.

21. That all of the factors, allowances, and adjustments set forth and used in the amended filing as modified and replaced by expert witness Stern, are reasonable, proper, and correct.

22. That based on the statistics supplied by the Rate Office in the filing; the factors, allowances, and adjustments supplied by the Rate Office in the filing as modified and replaced by the factors, allowances, and adjustments supplied by expert witness Stern; Exhibit ID-56A as testified to by expert witness Stern; and before the consideration of other relevant data as set forth in findings of fact numbered 24 through 30 below; the indicated rate level change for bodily injury coverage is a reduction of 18.8%, which finding is supported by the testimony of expert wit-

ness Stern and which is shown by the following computations:

|  | | ACCIDENT YEAR ENDED JUNE 30 | |
|---|---|---|---|
| | | 1972 | 1973 |
| (1) | Earned premium at present rates for $10,000/$20,000 limits | $111,796,082 | $121,823,542 |
| (2) | Incurred losses including all loss adjustment expenses, developed | $ 64,992,327 | $ 68,409,595 |
| (3) | Loss development factor | 1.009 | 1.035 |
| (4) | Incurred losses including all loss adjustment expenses, undeveloped (2) + (3) | $ 64,412,613 | $ 66,096,227 |
| (5) | Unallocated loss adjustment expenses factor | 1.101 | 1.101 |
| (6) | Unallocated loss adjustment expenses (4) — [(4) + (5)] | $ 5,908,877 | $ 6,063,323 |
| (7) | Incurred losses including allocated loss adjustment expenses, developed [(4) — (6)] × (3) | $ 59,030,270 | $ 62,134,056 |
| (8) | Trend | | |
| | (a) Annual percent change in pure premium | 0.0% | 0.0% |
| | (b) Number of years from midpoint of experience period to 4/1/75 | Not applicable because (a) is 0.0% | |
| | (c) Trend factor 1.0 + (8b) × (8a) | 1.00 | 1.00 |

Comr. of Insurance v. Automobile Rate Office

| | | | |
|---|---|---|---|
| (9) | Losses including allocated loss adjustment expenses, developed, and reflecting trend (7) × (8c) | $ 59,030,270 | $ 62,134,056 |
| (10) | Losses including all loss adjustment expenses, developed, and reflecting trend (9) + (6) | $ 64,939,147 | $ 68,197,379 |
| (11) | Loss ratio (10) ÷ (1) | .581 | .560 |
| (12) | Accident year credibility | .50 | .50 |
| (13) | Credibility weighted loss ratio | .570 | |
| (14) | Expected loss ratio | .702 | |
| (15) | Indicated rate level change [(13) ÷ (14)] — 1.00 | —18.8% | |

23. That based on the statistics supplied by the Rate Office in the filing; the factors, allowances, and adjustments supplied by the Rate Office in the filing as modified and replaced by the factors, allowances, and adjustments supplied by expert witness Stern; Exhibit ID-57B as testified to by expert witness Stern; and before the consideration of other relevant data as set forth in findings of fact numbered 24 through 30 below; the indicated rate level change for property damage coverage is an increase of 7.5%, which finding is supported by the testimony of expert witness Stern and which is shown by the following computations:

| | | ACCIDENT YEAR ENDED JUNE 30 | |
|---|---|---|---|
| | | 1972 | 1973 |
| (1) | Earned premium at present rates for $5,000 limit | $ 78,055,751 | $ 85,057,076 |
| (2) | Incurred losses including all loss adjustment expenses, developed | $ 53,982,813 | $ 60,630,169 |

(3) Loss development factor     .999     1.002

(4) Incurred losses in-    $ 54,036,850 $ 60,509,151
cluding all loss adjust-
ment expenses, undeveloped
(2) + (3)

(5) Unallocated loss adjustment     1.113     1.113
expenses factor

(6) Unallocated loss adjust-     $ 5,486,221 $ 6,143,337
ment expenses (4) —
[(4) ÷ (5)]

(7) Incurred losses in-     $ 48,502,078 $ 54,474,545
cluding allocated loss
adjustment expenses
developed [(4) — (6)] ×
(3)

(8) Trend

    (a) Annual change in
        pure premium     +.048     +.048

    (b) Number of years from
        midpoint of experience     2.25     1.25
        period to 4/1/75

    (c) Trend factor 1.0 + (8b)     1.108     1.060
        × (8a)

(9) Losses including allo-     $ 53,740,302 $ 57,743,018
cated loss adjustment
expenses, developed
and reflecting trend
(7) × (8c)

(10) Losses including all     $ 59,226,523 $ 63,886,355
loss adjustment expenses,
developed, and reflecting
trend (9) + (6)

(11) Loss ratio (10) ÷ (1)     .759     .751

(12) Accident year credibility     .50     .50

(13) Credibility weighted loss ratio     .755

(14)  Expected loss ratio                    .702

(15)  Indicated rate level change         +7.5%
      [(13) ÷ (14)] — 1.00

    24. That beginning in 1973 the National Association of Insurance Commissioners implemented a plan known as the Accelerated Monitoring System or as the Fast Track Monitoring System to collect data on a state by state basis from a large segment of the private passenger automobile insurance industry for the purpose of measuring the continuing impact of the "energy crisis" on private passenger automobile insurance losses.

*    *    *

    28. That from the testimony of expert witness Stern and of Rate Office expert witness Muetterties, the "energy crisis" data referred to above in findings of fact numbered 24 through 27 is supplementary data that should be considered by an actuary testifying in this rate case, which testimony supports this finding.

*    *    *

    31. That applying to basic limits coverage the rate changes of a 23.8% reduction in bodily injury rates and a 2.5% increase in property damage rates using Exhibit ID-58A as testified to by expert witness Stern, the following specific findings are made:

    A. The earned premiums to be anticipated by all companies operating in North Carolina considered as one company in the near future, i.e., for the year ending April 1, 1976 from writing private passenger automobile liability insurance, using the rates resulting from said 23.8% reduction in bodily injury rates and said 2.5% increase in property damage rates, are $104,032,478 for bodily injury and $97,716,518 for property damage for a total of $201,748,996, and

    B. The reasonably anticipated loss experience during the life of said policies for said year will be $73,030,800 for bodily injury and $68,596,996 for property damage for a total of $141,627,796, and

    C. The reasonably anticipated operating expenses in said period will be $28,192,802 for bodily injury and

$26,481,176 for property damage for a total of $54,673,978, and

D. The percent of earned premiums which will constitute a fair and reasonable underwriting profit for all of the insurance companies engaged in writing private passenger automobile liability insurance in that period in this State is 5%, reduced to 2.7% by consideration of the earnings of all companies writing automobile liability insurance in this State from the investment of unearned premium reserves and the investment income from loss reserves, totaling 2.3%, and

E. The underwriting profit which can be reasonably anticipated for all companies writing private passenger automobile liability insurance in North Carolina, using the rate level resulting from said 23.8% reduction in bodily injury rates and said 2.5% increase in property damage rates is $2,808,876 for bodily injury and $2,638,346 for property damage for a total of $5,447,222, on an anticipated volume of bodily injury earned premiums of $104,032,478 and of property damage earned premiums of $97,716,518 for a total of $201,748,996 which produces a 2.7% of earned premium underwriting profit before federal income taxes. Said 2.7% of earned premium provides for a fair and reasonable underwriting profit within the meaning of G.S. 58-248 and constitutes a fair and reasonable profit for all companies writing automobile liability insurance in this State for said period,

which findings are supported by the testimony of expert witness Stern.

32. That the above finding is based on proposed average rate (for basic limits) of $37.39 for bodily injury and $35.12 for property damage as shown by the following computations:

|  | B.I. | P.D. | Total |
| --- | --- | --- | --- |
| Present average rates | $ 49.07 | $ 34.26 | $ 83.33 |
| Proposed average rates (—23.8% BI; + 2.5% PD) | 37.39 | 35.12 | 72.51 |

---

Comr. of Insurance v. Automobile Rate Office

---

| | | | |
|---|---|---|---|
| (1) | Earned premiums to be anticipated at proposed rates | $104,032,478 | $ 97,716,518 | $201,748,996 |
| (2) | Anticipated loss experience (incurred losses and loss adjustment expenses) | $ 73,030,800 | $ 68,596,996 | $141,627,796 |
| (3) | Anticipated operation (underwriting expenses applicable) | $ 28,192,802 | $ 26,481,176 | $ 54,673,978 |
| (4) | Anticipated combined losses and expenses (line 2 + line 3) | $101,223,602 | $ 95,078,172 | $196,301,774 |
| (5) | Anticipated underwriting profit before Federal income taxes (line 1 − line 4) | $  2,808,876 (2.7%) | $  2,638,346 (2.7%) | $  5,447,222 (2.7%) |

33. That the mathematical computations in Exhibits ID-56A, ID-57B, ID-58A were verified and found to be mathematically correct.

34. That adjustments in private passenger automobile liability insurance rates consisting of a reduction of 23.8% for bodily injury and an increase of 2.5% for property damage will produce premium rates for the future which will provide for anticipated loss and loss adjustment expenses, anticipated expenses attributable to the selling and servicing of the line of insurance involved and will provide for a fair and reasonable underwriting profit, which finding is supported by the testimony of expert witness Stern.

35. That said premium rate adjustments are warranted and will produce rates that are reasonable, adequate, not unfairly discriminatory and in the public interest.

36. That said 23.8% bodily injury rate reduction and said 2.5% property damage rate increase results in an overall private passenger automobile liability insurance

rate reduction for 10/20/5 policy limits (the limits on which the amended filing was based) of 13%.

### CONCLUSIONS OF LAW

1. Under the provisions of Article 25 of Chapter 58 of the General Statutes of North Carolina, the Rate Office is required to submit to the Commissioner of Insurance annual rate proposals for bodily injury and property damage insurance on private passenger vehicles on or before July 1 of each calendar year.

2. Under the provisions of said Article, the Commissioner of Insurance must exercise his authority so as to produce rates which are reasonable, adequate, not unfairly discriminatory, and in the public interest, and it is concluded that the bodily injury rate reduction of 23.8% and the property damage rate increase of 2.5% will produce rates which meet these standards.

3. Under the provisions of said Article, proposed rates shall not be deemed unreasonable, inadequate, unfairly discriminatory or not in the public interest, if such proposed rates make adequate provisions for premium rates for the future which will provide for anticipated loss and loss adjustment expenses, anticipated expenses attributable to the selling and servicing of the line of insurance involved and a provision for a fair and reasonable underwriting profit, and it is concluded that the bodily injury rate reduction of 23.8% and the property damage rate increase of 2.5% will produce rates which make adequate provisions for all these items, including a provision for a fair and reasonable underwriting profit.

4. Under the provisions of said Article, the Commissioner of Insurance may take into consideration in the exercise of his rate authority the earnings of all companies writing automobile liability insurance in this State realized from the investment of unearned premium reserves and investments from loss reserves on policies written in this State by including the amount of such earnings in an equitable manner in the rate-making formula to arrive at a fair and equitable rate, and it is concluded that including such earnings expressed as a percentage of earned premiums in the profit and contingencies allowance (also expressed as a

percentage of earned premium) in the rate-making formula is a procedure whereby the amount of such earnings is included in an equitable manner in the rate-making formula to arrive at a fair and equitable rate.

5. Said Article provides that in determining the necessity for an adjustment of rates the Commissioner shall give consideration to past and prospective loss experience, including the loss trend and other relevant factors developed from the latest statistical data available; to such relevant economic data from reliable indexes which demonstrate the trend of costs relating to the line of automobile insurance for which rates are being considered and to such other reasonable and related factors as are relevant to the inquiry; and the "energy crisis" data referred to in the above Findings of Fact come within the description in this provision of said Article of what the Commissioner shall give consideration to; and therefore, it is concluded that the Commissioner is required by the provisions of said Article to give consideration to the "energy crisis" data in this record in determining the necessity for an adjustment of rates.

Now Therefore, It Is Hereby Ordered:

That private passenger automobile liability insurance rates for use in North Carolina in the future be decreased by 23.8% for bodily injury and increased by a 2.5% for property damage to be effective on May 1, 1975.

The order was based on the testimony of witness Stern. Without objection Stern was qualified as an expert witness and actuary in automobile insurance rate making. He testfied as follows:

"I started as a trainee with the Mutual Insurance Rating Bureau in 1946. I was appointed Assistant Actuary in 1949 and Actuary in 1957. I stayed with the Mutual Bureau until March of 1966 and then assumed the position of Actuary with the National Bureau of Casualty Underwriters, which is one of the predecessor organizations of ISO. I stayed with ISO until March, 1970, at which time I entered into the acturial consulting field, but I only stayed with that for about nine months and I then assumed my present position. I have testified in hearings as an expert witness involving

automobile liability insurance rates previously. I have done that extensively.

Describing the nature and extent of the work that I do in preparing for such testimony, part of that work, of course, involves the verification of underlying data which I used, the examination of rate-making techniques as to their reasonableness in achieving the objectives of the statute to have rates that meet the standards I just referred to. It involves making calculations where I find that the filing procedures do not meet the standards of our statutes.

I have been qualified in these various hearings in which I have testified as an expert in the field of automobile liability insurance rate making. I am a graduate of the University of Vienna Law School; I studied social insurance at the Graduate Faculty of the New School for Social Research in New York; I am a member of the American Academy of Actuaries and I am an Associate of the Casualty Actuarial Society.

During my career I have written papers, given lectures or taught courses involving subject matter related to the field of automobile liability insurance rate making. I constantly write on matters of insurance in relation to my daily work and advising legislative bodies in rating matters. I have written a paper pertaining to rate-making procedures for automobile insurance, which is on the—published by the Casualty Actuarial Society and it is one of their recommended readings for students of the Society.

I have been active in NAIC—that's the National Association of Insurance Commissioners—activities in regard to automobile liability insurance rate making. I was involved in several task forces, one pertaining to profitability, which, of course, profit, of course, is the true test of rate adequacy or excessiveness. I am presently involved in a task force that will take a new look at the method of determining classification differentials for private passenger cars. And I only recently worked with the staff of the NAIC on a program on improving the statistics for private passenger insurance. This latest report will probably be considered by the Executive Committee of the NAIC later on this month."

The most important item of documentary evidence on which Stern based his opinion was the Rate Office amended filing of January 2, 1975. The other documentary evidence was the fast track data (ID Exhibit No. 11, ID Exhibit 15, ID Exhibit No. 22, ID Exhibit No. 49, and ID Exhibit Nos. 50, 51, 52 and 53). Also considered were ID Exhibits 17 and 17A which were prepared by the Rate Office or by ISO at the Rate Office's direction concerned with investment income from unearned premium and loss reserves. Time and space will not permit reproduction of the exhibits in this opinion.

Except with respect to underwriting profit and the supplemental rate level reduction factor, the difference between the result indicated by the amended filing and the result reached by the witness Stern are due to the extent and method of trending past loss experience to a date in the future and the data on which those results were reached.

The Rate Office witnesses testified in support of a trending method which used an annual trend factor combining claim frequency with average paid claim costs and which trended losses to March 1, 1976. Twelve year-ended quarters of average paid claim costs experience and sixteen year-ended quarters of claim frequency experience were employed. Obviously, the data on which the trending was based and the method employed by the Rate Office gives minimal effect to experience after September of 1973 for several reasons:

(1) The number of points selected to compose the trend line prior to October of 1973, in one instance: ten, and in the other: fourteen, dampen the effect of the two points of experience which were used after September of 1973.

(2) The use of a year's experience to constitute points on a trend line dampens the effect of experience during only part of that year.

In contrast to the method employed by the Rate Office, Stern adopted the following trending procedures:

(1) Instead of using a combination trend factor, Stern (using data supplied by the Rate Office in the amended filing) trended pure premium per car (or average loss per car insured) which is the most straight-forward method of measuring what it costs to insure cars. ID Exhibit No. 54 shows the result of this trending process with respect to bodily injury liability

losses per car insured for the period between June 30, 1970 and March 31, 1974. The witness concluded that no trend for bodily injury losses was shown in the Rate Office data. ID Exhibit No. 55 shows the result of this trending process with respect to property damage liability losses per car insured for the same period and shows an annual percentage increase of 4.8% in the average loss cost per car.

(2) In view of the fact that the fast track data indicated that there was a drop in the pure premium for property damage losses of six percent with respect to the 11/12's year ended November 1974 as compared to the 11/12's year ended November 1973 (ID Exhibit 53) which was contrary to the indications of the Rate Office data (which showed according to Stern's calculations a 4.8% annual increase based on 12 quarters of year ended experience through March 31, 1974) Stern concluded that one year during the trending period with respect to property damage liability losses should be carried at unity or "no trend." In regard to bodily injury losses Stern had already established a trend of unity or "no trend" so that the trend period was immaterial.

(3) Stern also concluded that the trend period should end at April 1, 1975 rather than March 1, 1976, the trend termination date selected by the Rate Office, in view of the contrary indications of the Rate Office data and the fast track data.

(4) With respect to trending unallocated loss adjustment expense, Stern testified that in view of the fact that experience had shown that such expenses had not followed the rise in losses, and in view of the fact that unallocated expense factors had decreased over the years, it would be improper to apply an upward trend to this item of expense.

In addition to the rate reduction indicated by this witness' revision of the trending procedures used in the Rate Office's amended rate making formula, Stern testified that a supplementary rate reduction of 5% was proper based on: (1) the indications of the fast track data; (2) the increased cost of gasoline; (3) the current rate of unemployment in this State; and (4) the reduction in speed limits. Stern was careful to point out that the 5% reduction was not to be magnified by future trending but was a *one time* adjustment.

Stern further testified that there was a cushion or excessiveness in the present rates due to the lack of frequency trending

in past Rate Office filings and a small excess in the underwriting profit allowance. With respect to the credibility of the Rate Office amended filing, Stern testified that the trending method employed by the Rate Office often understates the effect of a frequency downward trend and in the present case the Rate Office's use of a 3% upward trend factor for bodily injury losses "grossly overstates the future loss levels."

With respect to the validity of the fast track sample, Stern testified that he saw no possibility that data not reported under fast track would show a different experience.

With respect to appellants' contentions that Stern's testimony and the Commissioner's order take no account of inflationary trends, ID Exhibit 53 (which shows a 6 percent decline in the property damages losses per car insured for the 11-month period ending November 1974 as compared with a similar period in 1973) indicates that the *decline in frequency* has had more effect than inflation.

Stern's conclusions seem justified from the experience supplied by the Rate Office and by "other relevant factors developed from the latest statistical data available" within the meaning of G.S. 58-248. This was material and substantial evidence.

The conclusion reached in the majority opinion is based upon and limited to a restricted part of the testimony of expert witness Stern. This testimony supported the 11 findings of fact set forth in the majority opinion and was primarily concerned with economic data. Thus, it is necessary to consider whether the Commissioner is limited to the use of insurance statistics— the expense, premium and loss experience of the insurance companies—in the automobile liability insurance rate making process. Appellants contend that the appellate courts have approved this process, citing cases. This is so, but I fail to find that the courts have rejected the use of "other data" which may be relevant to the rate making process.

"It is not a proper ground for the rejection of such evidence that such projection of an upward or downward cost trend into the future has never before been used in the rate making process. *In re Filing by Fire Insurance Rating Bureau,* 275 N.C. 15, 36, 165 S.E. 2d 207, 222 (1969).

G.S. 58-248 provides, inter alia, "In determining the necessity for an adjustment of rates the Commissioner shall give

consideration to past and prospective loss experience, including the loss-trend and other relevant factors developed from the latest statistical data available; to such relevant *economic data* from reliable indexes which demonstrate the trend of costs relating to the line of automobile insurance for which rates are being considered and to such *other reasonable and related factors as are relevant to the inquiry. . . . "*

The language of the statute is broad enough to include evidence, if otherwise competent, received not only through the Rate Office but from other sources as well. *Commissioner of Insurance v. Automobile Rate Office,* 287 N.C. 192, 203, 214 S.E. 2d 98 (1975).

In essence, the statute provides that while insurance company experience is an appropriate element in automobile liability insurance rate making, other data may be relevant to rate making and should be given due consideration.

The fast track information was volunteered by industry to provide some weight as to what effect, if any, the energy crisis might have. Rate Office witness Kollar considered fast track data valid statistics. John H. Muetterties, another witness for the Rate Office, stated that the fast track data contained relevant information that should be considered in the rate making hearing. Witness Stern explained the background of the fast track data and said that it was relevant information for rate making. The data represented 65 percent of the cars insured in North Carolina and showed the following: First eleven months of 1973 compared to first eleven months of 1974: Frequency of bodily injury claims: down 13%; Actual cost in property damage claims per car insured: down 6%. In contrast, the latest information provided by the Rate Office filing was a report on claim frequencies and average paid claim costs as of the year ending *31 March 1974.*

The Commissioner is free to hear all evidence of any type having reasonable probative value, including any evidence of the type upon which responsible persons are accustomed to rely in the conduct of insurance affairs. *In re Filing by the Automobile Rate Office,* 278 N.C. 302, 318, 180 S.E. 2d at 166 (1971). Thus, the testimony of Stern, along with the exhibits presented at the Commissioner's hearing, was relevant and its credibility and weight was to be determined by the Commissioner.

---

---

Appellants further contend that the Commissioner acted in excess of and contrary to the statutory rate making process by converting the 1974 Filing into a rate reduction hearing rather than a statutory hearing under G.S. 58-248 wherein he was required to approve or disapprove the 1 July 1974 Filing by the Rate Office. This brings into direct focus the applicability of both G.S. 58-248 and G.S. 58-248.1 in the present proceeding. This presents another interesting question raised by the record and briefs which was not addressed by the majority opinion.

The authority of the Commission is not limited under G.S. 58-248 to approve or disapprove all or any part of any change between the existing rate level and the proposed rate level. This would work an impasse. There is nothing in the statutes that require the Commissioner to accept the rate or rates proposed, or to reject them altogether. See *Utilities Commission v. Telephone Co.,* 263 N.C. 702, 140 S.E. 2d 319. The Rate Office filing proposed new rates—not just a change in the rates. This is not an interim rate hearing. The Rate Office was the petitioner in the proceeding and requested an increase in the rate level. But the Attorney General also intervened and filed a motion on behalf of the consuming public. He moved that the results of the accelerated (statistical) monetary system being developed by the National Association of Insurance Commissioners' Task Force, fast track information, be available to the parties and that the effect of the "energy crisis" be taken into account as fully as possible in any order of the Commissioner resulting from these proceedings. Thus, the provisions of G.S. 58-248.1 became applicable.

Another important question, raised by the record and briefs but not discussed nor decided in the majority opinion, concerns what constitutes a fair and reasonable profit. In examining the propriety of allowing 5% for underwriting profit there is no evidence to show that the amount proposed by the Rate Office is a fair and reasonable profit. It is not a question of law, nor is it a question upon which the determination of the Rate Office is conclusive. It is a question of fact to be determined by the Commissioner upon evidence. The burden of proof is upon the Rate Office to show that the existing premium rates are not sufficient. There is nothing sacrosanct about 5% in connection with what is fair and reasonable profit. Whether five cents out of each dollar of gross revenue, i.e., Earned

Premiums, is a fair and reasonable profit, an excessive profit or an insufficient profit must be determined by the Commissioner from evidence and this, too, involves a projection into the future of past experience and present conditions. It involves consideration of profits accepted by the investment market as reasonable in business ventures of comparable risk. See *In re Filing by Fire Insurance Rating Bureau, supra.*

Appellants argue that for the first time the question is squarely presented to the court as to the propriety of the Commission in deducting from the rate increase proposed by the Rate Office a percentage figure to take into consideration directly prior investment earnings. This question was likewise left unanswered by the majority opinion.

Appellants contend that investment earnings can only be considered in arriving at a formula to be used to determine what is a "fair and reasonable underwriting profit."

G.S. 58-248 provides, inter alia, "The Commissioner of Insurance in considering any rate compiled and promulgated by the bureau may take into consideration the earnings of all companies writing automobile liability insurance in this State realized from the investment of unearned premium reserves and investments from loss reserves on policies written in this State. The amount of earnings may in an equitable manner be included in the rate-making formula to arrive at a fair and equitable rate." Thus, it appears that the General Assembly authorized the Commissioner, not the insurance industry, to consider investment earnings for rate making purposes rather than a formula to determine profit. The statute authorized the Commissioner to determine what was a reasonable profit and the burden of proof was on the Rate Office to justify the proposed amount. They failed to prove a profit of 5% was justified. On the contrary, expert witness Stern testified: "It is my opinion under the circumstances in this case and after reviewing the filing that the 2.7 percent for underwriting profit and contingencies would be just and reasonable."

In the application of the "substantial evidence standard," courts will generally defer to the expertise of the administrator in his specialized field if there is reasonable evidence to support his decision. The law imposes on the Commissioner of Insurance, not us, the duty to approve rates.

The court has a supervisory function of review of agency decisions. This includes examining the evidence and fact findings to see both that the evidentiary fact findings are supported by the record and that they provide a rational basis for inferences of ultimate fact. The entire process combines judicial supervision with a statutory principle of judicial restraint.

The testimony of expert. witness Stern, together with the exhibits presented, provided more than a .scintilla of evidence supporting the Commissioner's order. The evidence measured up to the standard required as legal support for the Commissioner's findings. The conclusions followed. The two support the rate level authorized.

In my opinion the decision and order of the Commissioner of Insurance that private passenger automobile liability insurance rates for use in North Carolina in the future be decreased by 23.8% for bodily injury and increased by 2.5% for property damage, effective 1 May 1975, should be affirmed.